CARR v. SCHAFER ET AL.

1. CARRIERS OF GOODS — SPECIAL CONTRACT — EVIDENCE.— When a freighter acting as a common carrier contracts in writing to transport perishable goods across the country, and the goods become injured by frost, his liability must be measured by the written contract.

Evidence of previous conversations and negotiations of the parties leading up to the contract cannot be considered for the purpose of altering its terms.

2. EVIDENCE — RULE WHEN VEHICLES SELECTED BY SHIPPER.— Where in such case the shipper selects and approves the wagons to be used, evidence that those selected were unsuitable is incompetent to show negligence on the part of the freighter.

*Appeal from District Court of Pitkin County.*

THIS appeal is prosecuted under the act of 1885. It appears from the abstract of record that on the 1st day of November, 1885, appellant, who was defendant below, was about to commence the business of transporting or freighting goods with horses or mules and wagons from the railroad station at St. Elmo through and over the mountains to the town of Aspen. Parcells, appellee, was at St. Elmo, and had there, in a car, a lot of nursery stock consisting of trees, shrubs, plants and roots, in bales, barrels and boxes, and applied to appellant to haul them to Aspen. Woods, a witness, was engaged at St. Elmo in a commission and forwarding business, and assisted Parcells in finding transportation and shipping the goods, and acted as the agent of Parcells after his departure. Parcells, with the assistance of Woods, made a contract with Carr to deliver the goods at Aspen. Parcells left St. Elmo before a written contract was made, but before he left Woods submitted a memorandum to him in regard to the contract, which was approved. Afterwards, the contract to be found in the opinion was made by Woods from such memorandum, and signed by Carr.

Before making the contract Parcells examined the wagons of defendant, and approved of them. Woods, as the agent of Parcells, attended to the loading of the goods, and by packing with hay and other material protected them as far as practicable from freezing. The goods were packed in three wagons, which left St. Elmo on November 3d for their destination. The ordinary or average time for making the trip with freight between the two towns was shown

to have been five days, when the roads were in an ordinarily good condition. On the second day out a severe snow-storm was encountered, and the weather turned very cold. This delayed the teams. The goods did not arrive at Aspen until the 21st and 22d of the month, and were then found to be badly damaged by freezing. Appellees refused to receive them, and brought suit to recover their value. The complaint is as follows, omitting portions unnecessary to be considered:

"The plaintiffs complain and allege of the defendant (1) that the amount involved in the action does not exceed the sum of $2,000; (2) that at the times hereinafter mentioned the defendant was a common carrier of goods for hire between the places hereinafter named; (3) that on the 2d day of November, A. D. 1885, at the town of St. Elmo, county of Chaffee, of the state aforesaid, the plaintiffs delivered to the defendant certain goods and chattels, to wit: one bale of trees, three barrels of nursery stock, six boxes of trees, five boxes of strawberry plants, the property of the plaintiffs, of the value of $1,726.65; and the defendant, as such carrier, received the same, to be by him safely carried to the town of Aspen, of the county of Pitkin, of the state aforesaid, and there to deliver to the plaintiffs on the 5th day of November, A. D. 1885, for a reasonable reward to be paid by the plaintiffs therefor, to wit, the sum of $1.25 per hundred-weight; (4) that the defendant did not fulfill his agreement to carry safely the said goods, and to deliver the same to the plaintiff in the said town of Aspen on the 5th day of November, A. D. 1885, but on the contrary, although the period between the said day when said goods were received by the defendant and the said day when they should have been delivered to plaintiffs was a reasonable time for the carrying of the same from the said town of St. Elmo to the said town of Aspen, yet the defendant so negligently and carelessly conducted, and so misbehaved in regard to the same, in his calling as common carrier, that he failed to deliver the same or any part thereof until the

22d day of November, A. D. 1885, in the said town of Aspen; (5) that the defendant did not safely carry and deliver the said goods pursuant to said agreement; but on the contrary, the defendant so negligently conducted, and so misbehaved in regard to the same, in his calling as common carrier, that the said goods were wholly lost to the plaintiffs, to their damage in the said sum of $1,726.65. Prayer for judgment."

Defendants answered, specifically denying every allegation of the complaint. The case was tried by a jury, resulting in a verdict and judgment against appellant for $562.50 and costs.

Messrs. WILSON & STIMSON, for appellant.

Mr. W. W. COOLEY, for appellee.

MR. JUSTICE HAYT delivered the opinion of the court.

It is stated in the complaint that appellant was a common carrier, and, although denied in the answer, it seems to have been conceded at the trial that such was the capacity in which he contracted. The trial court assumed by its instructions that his liability was to be controlled by the law applicable to common carriers, and the correctness of such assumption is not challenged upon this appeal. In determining his liability, we shall therefore assume that he contracted as a common carrier, and measure his responsibility for the damage resulting from the freezing of the goods in transit by the strict rules governing such carriers, except so far as the same were modified by the special contract of the parties offered in evidence.

In reference to such special contract, the following is the substance of the testimony of H. N. Wood, one of the firm of Wood Bros., and it is not contradicted: "That in November, 1885, witness was a forwarding agent at St. Elmo; that as such forwarding agent he received from the Union Pacific Railroad Company at St. Elmo a lot of goods marked 'Nursery Stock, etc.,' consigned to H. A. Parcells

& Co., plaintiffs; that he delivered these goods to defendant, Carr, for transportation to Aspen; that he obtained these goods from the railway company on presenting the bill of lading under which they had been shipped from Denver to St. Elmo; this bill of lading had been given to witness by plaintiff Parcells; that, at Parcells' request, witness went with him to find a freighting outfit to transport the goods in question from St. Elmo to Aspen; that they found some freighters whose wagons Parcells examined and pronounced to be not large enough for properly packing the nursery stock so as to protect it from frost, and so not suitable; that, on Parcells' request, witness introduced him to defendant, who was about to engage in freighting between St. Elmo and Aspen; that, on the afternoon of the same day (November 1st), defendant's wagons arived at St. Elmo from Arizona, and that Parcells examined these wagons and pronounced them to be 'just the thing he wanted;' that these wagons were the ones in which the goods were packed for shipment; that the wagons examined in the morning by witness and Parcells were such as were ordinarily used at that time for freighting between St. Elmo and Aspen; that in the several conversations witness had with Parcells witness told Parcells that he would be obliged to ship the goods at owner's risk, and defendant also stated that he wanted to receive the goods at owner's risk; that it was agreed that the goods should not remain over-night on top of either range; that witness afterwards, in presence of Parcells and defendant, made a memorandum of the arrangement between Parcells and defendant; this memorandum was to go on the bill of lading, and from it witness afterwards drew up a bill of lading as the contract between Parcells and the defendant." The witness further testifies that he took the goods out of the railway car and superintended their packing in the defendant's wagons; that they were packed with hay on the bottom and sides, and hay and grain on top; that they were packed in this way to keep them from freezing, the matter of their freezing hav-

ing been discussed; that witness had been in freighting business more or less since 1878; that the letters " O. R.," in connection with the word " freezing," signify " owner's risk."

The bill of lading introduced in evidence reads as follows:

"No. ——.                    ST. ELMO, November 2d, 1885.

" Way-bill of goods forwarded by Woods Bros., by James Carr, freighter to Aspen, Colorado.

| No. | Ex. | NAME. | ARTICLES. | Weight. | Rate. | Amount. | Adv. Chgs. | Com. | Total. |
|---|---|---|---|---|---|---|---|---|---|
| 15 | | H. A. Parcells . | 1 Bale Trees ...<br>3 Bbs. N. Stock<br>6 Boxes Trees..<br>5 Boxes Straw-<br>berry Plants | 3110 | $1 25 | $38 90 | $3 00 | | $41 90 |

O. R. Freezing.

By Cash ..................... $25 00
Balance Due............... 16 90

" If this consignment is delivered in Aspen by the evening of November 4, 1885, the freighter shall be paid $10 extra above the regular freight. It is further agreed that the said freighter·shall not expose his load on either range over night, and take the best possible care of same.

" Received the above goods in good order and condition, which I agree to deliver to consignee in same order and condition.

" [Freighter's signature.]

" JAMES CARR. per MC."

This was duly signed for Carr, and accepted by the forwarders for appellees. It constitutes the only written evidence of the contract between the parties, and must be taken as the only contract for the transportation of the

goods. Evidence of the previous conversation and negotiations of the parties leading up to the contract cannot be considered for the purpose of altering its terms.

The measure of the liability of appellant must be determined by the written contract. By the terms of this instrument he expressly acknowledges the receipt of the property in good order, and expressly agrees to deliver it in the same condition. This is the customary contract of a common carrier. There is no agreement to deliver the property in Aspen by November 5th, although it does contain a stipulation by the consignee to pay $10 additional if the property should be delivered in Aspen by the evening of November 4th. It is also agreed that the property shall not be exposed on either range over night, and that the freighter will take the best possible care of the same. It is further provided that the property shall be carried at the owner's risk of freezing. It is, in fact, the ordinary common carrier's contract, loss by freezing excepted, and an agreement that the property should not be exposed to the severity of the weather which might prevail at the summit of the mountains to be crossed. But there was no agreement that the property should be delivered at its destination by the 5th day of November, as alleged in the complaint; and the submission to the jury of the question whether there was such an agreement was error. As we have seen, the liability of appellant was fixed by the written contract, and by that alone.

The evidence shows that this was appellant's first experience in freighting over the road between St. Elmo and Aspen; that his teams had just arrived in that section of the state, as Parcells well knew, and that Parcells examined the wagons before contracting with him, rejecting some and selecting others as suitable for the work. Under the circumstances, he alone was responsible for the character of the wagons employed, and is estopped from claiming that they were not suited to the business. And the testimony introduced by appellee tending to show that the convey-

ances selected were unsuitable was incompetent for the purpose of showing negligence on the part of appellant, and the instructions to the jury to this effect were erroneous.

The ruling of the trial court does not, as supposed by counsel, find support in anything which was said in the case of *Transportation Co. v. Cornforth*, 3 Colo. 280. The facts in the two cases are totally dissimilar. The selection of the car in which the goods were transported in that case was left entirely with the carrier. It was shown that it was customary to use refrigerator cars for the transportation of fruits in the winter season from New York, the place of shipment, to Denver, the place of destination, while the carrier in that instance used an ordinary box-car, with apertures through which the cold and snow entered. The evidence showed that the injury resulted from the gross negligence of the carrier; and the court held that public policy would not permit the carrier by special agreement to be relieved from damages occasioned by negligence or misfeasance in him or his servants. In that case the cars were selected by the carrier; in the case at bar the wagons were selected by the shipper and pronounced by him "just the thing." In addition to this, it would be unreasonable to measure the duty of an ordinary freighter in providing vehicles for the transportation of perishable goods with that of a company contracting for transportation across the continent by rail.

As we have seen, the goods were shipped at the owner's risk of freezing. This does not, however, relieve the carrier from loss resulting from his own negligence. The law will not permit a common carrier to contract against liability for his own negligence or that of his servants and employees. *Transportation Co. v. Cornforth, supra; School Dist. etc. v. Railroad Co.* 102 Mass. 552; *Railway Co. v. Wilcox*, 84 Ill. 239; *Railroad Co. v. McCloskey*, 23 Pa. St. 526.

Whether or not the loss complained of was occasioned by

the negligence of the carrier in this case, or resulted as an inevitable consequence from the condition of the road and the severe weather encountered, without the fault of the carrier, are questions for the jury to determine under proper pleadings and instructions. For the errors pointed out the case must be reversed and the cause remanded for further proceedings.

*Reversed.*