Bissell, J.
The liability of a common carrier for the safe and reasonably expeditious transportation of goods entrusted to his care has been established by a continuous and practically unbroken series of authorities. The reduction in the charges for the carriage of freight, which has resulted from the enormous competition between carriers and the unprecedented extension of the railroad system throughout the western country, has led to repeated assaults upon the principle, and many attempts to escape from its force by the preparation of long and elaborate contracts as between the carrier and the consignor and the consignee. A contract was executed in this case between the consignor and the receiving railroad company, which by its terms, if it were an independent obligation, would have absolved all lines upon which the freight might go for damages sustained from any other cause than derailment and collision. We are relieved, however, from any consideration of this contract or any speculation as to what the liability is or ought to be, since this matter has been set at rest by antecedent adjudications in this state. Whatever the contract may be, it is impossible for the carrier, by his agreement, to escape responsibility for any loss which may result from his negligence, or the malfeasance of his employees. Merchants' Dispatch & Trans. Co. v. Cornforth, 3 Colo. 280; Carr v. Schafer, et al., 15 Colo. 48.
This element of difficulty is therefore eliminated from the case. It appears from the record that early in November, 1886, Elwanger & Barry shipped a lot of nursery stock to Milton, the plaintiff in error, over the New York Central and Hudson River road. Over that and connecting lines the stock reached Denver on the 12th of that month, and according to the system prevailing between the connecting *309 roads was delivered to the defendant in error, the D. & R. G. R. R. Co., on what is called the receiving track designated for this purpose. The stock remained in Denver in the custody of the Denver & Rio Grande Company for a very considerable time, reaching Durango on the noon of the 23d of November. The delay is unexplained, nor can it be ascertained on what day the freight was forwarded to Durango, the record simply showing that it could not have been shipped prior to the 17th or 18th. When the goods reached Denver, and were delivered to the Rio Grande Company, their agent in Durango was notified, and he was directed to see that $608 was deposited for the freight claimed to be due on material. The demand for this sum led to the production of a bill of lading issued by the New York Central and Hudson River Company, which provided for a through freight rate of $248 per hundred, which at the specified weight would make the sum due $496. This contention on the part of Milton led to telegraphic communication between the agent at Durango and the general agent of the company in Denver. Subsequently the Durango agent notified Milton that the freight “ racket ” was all right, and the matter disposed of. For some reason, however, when the freight was forwarded to Durango there had been no correction of the bill of lading, and the freight arrived subject to the collection of $608, in place of the agreed rate of $496. On the afternoon of the 23d, which was the day of the arrival, the agent and the consignee verified the amount of the shipment by counting the number of boxes, and opened one box for the purpose of learning its condition. There seemed to be but little, if any, frost in the package, and the stuff was apparently in good condition. At any rate, from the evidence upon that subject, the jury would have been entitled to find in the absence of adverse proof that on the day of arrival the freight had been uninjured by the weather. Milton insisted upon the delivery of his goods, and that the demand of $608 was wrong according to the bill of lading under which the goods were shipped, and that the Rio *310 Grande Company was bound by the rate agreed upon by the connecting shipper from whom, in due course, that company had received it. As will appear subsequently, the Rio Grande Company acknowledged the obligation and force of that contract of shipment. From the terms of the bill of lading, and the subsequent course of the company, a jury would have been entitled to find that the first carrier had authority to bind the connecting lines by the rate which it might agree to accept for a continuous and through carriage. The demand made by the agent, and the contention of Mil■ton to the contrary, led to a long telegraphic correspondence between the head-quarters in Denver and that point, and the controversy ended in a demand by Milton, on the 26th of November, and a tender of the §496, which was due under the bill of lading. The money was there accepted and the goods were afterwards delivered to the consignee. When the goods were received it was found that they were solidly frozen together, and the stock ultimately proved nearly a total loss. It is not clear from the testimony as to when or how the loss occurred. The weather was shown to have been exceedingly cold between the 2Sd and 26th, while the goods were held in Durango by the railroad company on their claim for freight, and it was in proof that the weather continued cold from the 26th to the 29th. The goods were not taken out of the cars by Milton until the 29th. The case disclosed an inquiry by the general agent in Denver, whether the stock should be shipped in box cars or refrigerator cars. Milton declined to give any order in the premises. It does not appear whether stock of this description could be prudently and safely shipped at that season of the year in box cars, or whether cars of the other description ought to have been used; nor is it apparent whether there is any difference in the cost of shipment in the two classes of rolling stock, nor whether according to the custom and usage of carriers and shippers the duty of selection devolved upon the one or the other. These suggested difficulties make it very apparent that if the judgment rested upon the verdict *311 of a jury, which had found the facts in favor of the railroad company, there would be no interference with the verdict.
Upon the conclusion of the plaintiff’s case a motion was made for a nonsuit, which was sustained and judgment was entered for the defendant. Error is predicated upon this action, and substantially this is the only question entitled to be considered. The objection that the motion was made ore terms is groundless. Under the well recognized rules covering the trial of cases, motions of this description are always properly made in that manner and rest on a simple suggestion of the objection that under the proof or under the law the plaintiff has no right to recover. The right and the power of the court to grant a motion of this description is conceded by all the cases. When error is committed in this regard it arises from the erroneous exercise of the power. The question of error in the present case is not free from doubt and obscurity. It has been resolved with less hesitation than would otherwise embarrass the court, since the dispute will be left to the ultimate consideration of a jury, with the aid, probably, of more accurate and satisfactory proof on both sides as to the proximate cause of the loss. The record may be fairly said to present proof tending to show that the loss happened between the 23d and 26th of November, while the freight was withheld from the consignee upon a claim Which the company had no right to assert. The plaintiff was entitled to a finding as to the right of the New York Central Railroad Company to make a through contract rate. There was such proof of an acceptance of the contract made by the original carrier, that the jury would, in the absence of countervailing testimony, be warranted in finding the original carrier had authority to bind the connecting line. The bill of lading was presented to the agent of the company at Durango. This showed the freight to be guaranteed and to be $496. Evidently these facts were disclosed to the authorities in Denver. Since the agent subsequently said that the company would recognize this bill and rate, the jury without other showing would probably have been entitled to *312 find that the railroad company was bound to deliver the goods upon their arrival in Durango without the payment of freight, according, to the custom of carriers, and that at least it was without right to.refuse to deliver except upon payment of a different rate from that named in the contract. Under these circumstances the consignee was relieved from the obligation to make a tender and a demand according to the contention of counsel. The binding force of this bill of lading, according to the established course of business between railroad companies, could of course have been much more satisfactorily established, and doubtless will be upon a subsequent trial, but as the case stood the plaintiff was entitled to go to the jury without any other proof of demand or tender. The goods were held by the agent in Durango because they liad been shipped under an erroneous bill, and not in the assertion of a valid .claim for a different freight rate. If this mistake and negligence on the part of the company occasioned the delay between the 23d and 26th, and the goods were frozen during that period, the plaintiff certainly made out a prima fade case which entitled him to a verdict, and the case should not have been taken from the jy- _
_ It is likewise insisted that the pourt committed error in refusing to quash certain depositions taken on behalf of defendant in eiTor. Cross-errors seem to have been assigned by defendant in error, because of the action of the court with reference to sundry depositions taken by the plaintiff and read upon trial. As the questions are presented by the arguments of counsel, and by the abstract, the action of the court in the premises seems to have been in accordance with the law, and there was no error committed in this regard.
For the reasons stated, the judgment will be reversed and the cause sent back for further proceedings in conformity with this opinion.

Reversed.